## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Myia Angela Standberry, *as Trustee for*                    Civil No. 23-221 (DWF/DLM)
*the Next of Kin of Nekeya Tamara Moody*,

                    Plaintiff,

v.                                                          **MEMORANDUM**
                                                          **OPINION AND ORDER**

Ramsey County; Steven Eddicus and Joe
Stradinger, *Sheriff's Deputies in their*
*individual and official capacities*,

                    Defendants.


## INTRODUCTION

This matter is before the Court on Defendants Ramsey County, Steven Eddicus,

and Joe Stradinger's motion for summary judgment (Doc. No. 50) and motion to exclude

the expert testimony of Dr. Ronald K. Wright (Doc. No. 58).  Plaintiff Myia Angela

Standberry opposes the motions.  (Doc. Nos. 64, 65.)  For the reasons set forth below, the

Court grants Defendants' motion to exclude expert testimony and grants in part and

denies in part Defendants' motion for summary judgment.

## BACKGROUND

This case revolves around the tragic death of Nekeya[1] Moody following a medical

call with the Ramsey County Sheriff's Office.  At 7:46 p.m. on February 6, 2020,

---

[1]      Moody's first name is currently misspelled on the docket due to an error in the
complaint caption.  The Court directs the Clerk of Court to correct the party text for
Plaintiff to "*as Trustee for the Next of Kin of Nekeya Tamara Moody*."

Deputies Eddicus and Stradinger of the Ramsey County Sheriff's Office (collectively, the "Deputies") were dispatched to a house in Little Canda, Minnesota for a medical call. (Doc. No. 54 ("Eddicus Decl.") ¶ 2, Ex. 1 ("Eddicus Report") at 2; Eddicus Decl. ¶ 4, Ex. 3 ("Stradinger Report") at 2.)  Dispatch informed Eddicus and Stradinger that a woman, later identified as Moody, was experiencing a seizure or a panic attack, the scene was "chaotic," and screaming could be heard in the background of the call.  (Eddicus Report at 2; Stradinger Report at 2.)  While the Deputies drove to the house, dispatch clarified that the woman was having a panic attack, not a seizure.  (Eddicus Decl. ¶ 5, Ex. 4 ("Eddicus BWC") at 01:51:04-12.)[2]

Eddicus and Stradinger parked down the block from the house at 7:52 p.m.  (*Id.* at 01:52:08.)  The Deputies walked down the block to the house, arriving about a minute later.  (*Id.* at 01:52:08-53:17.)  As the Deputies approached the house, voices could be heard from inside, including Moody crying and screaming and her cousin repeatedly

---

[2]    At summary judgment, a court must view the facts in the light most favorable to the nonmoving party, but only if there is a genuine dispute as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  However, "a court should not adopt [the nonmoving party's] version of the facts" at summary judgment when that version is "blatantly contradicted" by video evidence.  *Id.*  Instead, a court should "view[] the facts in the light depicted by the videotape."  *Id.* at 381; *see also Ransom v. Grisafe*, 790 F.3d 804, 807 (8th Cir. 2015) (viewing facts in light depicted by video where neither party disputed the accuracy of the video)

Both parties rely heavily on Eddicus and Stradinger's body-worn camera videos to present their version of the facts.  Neither party disputes the accuracy of the videos, but they disagree on many facts.  The Court has independently viewed the videos and relies on them throughout this Opinion.  In doing so, the Court draws all inferences in the light most favorable to Standberry where applicable and, likewise, adopts the version of the facts supported by the video where Standberry's version is "blatantly contradicted" by that video.

telling her to "calm down." (*Id.* at 01:53:17-36.) Eddicus reached the door first and Moody's aunt said "Thank you, Officer. Here she is." (*Id.* at 01:53:35.) Moody's aunt and cousin were seated on a couch in the living room. (*Id.* at 01:53:35-44.) Moody sat on the ground in front of her cousin while he held her shoulders with his arms. (*Id.*)

As the Deputies entered the home, Moody began crying and yelling again, shouting many things like "No! No! Officer, please!" and "They're trying to kill me!" (*Id.* at 01:53:35-45.) Eddicus approached Moody saying, "it's okay" and asked the family "Okay, what's going on?" (*Id.* at 01:53:37-44.) Moody's cousin explained that Moody was just released from the eighth floor of Regions Hospital.[3] (*Id.* at 01:53:46-48.)

Moody said to the officers "pull out your pistols" and continued to reference someone trying to kill her. (*Id.* at 01:53:50-53.) At that point, Eddicus asked Moody for her name, introduced himself, and asked how she was doing. (*Id.* at 01:53:52-59.) Moody responded, "My name is Nekeya" and said, "take your pistol out." (*Id.* at 01:53:54-54:00.) Eddicus responded, "No no no no no. We're not gonna do anything like that." (*Id.* at 01:54:00-02.) He then asked Moody what was going on, to which she responded, "they're trying to kill me." (*Id.* at 01:54:02-05.) Eddicus asked who was trying to kill her. (*Id.* at 01:54:05-06.) Moody's eyes got big, and she said "Oh! You guys are working with them!" (01:54:06-08.) Moody then started to squirm more, but her cousin continued to hold her while he sat on the couch. (*Id.*)

---

[3]     The eighth floor of Regions houses its Mental Health Unit. It seems the Deputies were familiar with this unit in their conversation with Moody's cousin. Regardless, their reports otherwise reflect that they were aware that Moody was having some kind of mental health crisis. (*See* Eddicus Report at 2; Stradinger Report at 2.)

Eddicus and Stradinger responded "no," "it's okay," and told her to calm down. (*Id.* at 01:54:08-12.)  Moody continued squirming and reached her left arm toward Eddicus, flailing it near his side where his service weapon was holstered.  (*Id.* at 01:54:08-16; Eddicus Decl. ¶ 6, Ex. 5 ("Stradinger BWC Pt. 1") at 01:54:08-16; *see* Eddicus Report at 2.)  Eddicus interpreted this as Moody reaching for his service weapon. (Eddicus Report at 2.)  Moody eventually put her hand on her cousin's hand which he was using to hold her.  (Eddicus BWC at 01:54:08-16.)  Eddicus also began holding Moody's arm against her chest and her cousin's hand.  (*Id.* at 01:54:13-20.)  Throughout this, Moody continued to say things along the lines of "you're working with them."  (*Id.* at 01:54:08-14.)  Eventually she began screaming and shouting "Police!  Police!"  (*Id.* at 01:54:15-18.)  Her cousin continued to hold her in the same position and repeatedly told her to "calm down."  (*Id.* at 01:54:08-20.)

After about fifteen seconds of Moody continuing to squirm and saying that the Deputies were working with the people trying to kill her, the Deputies approached Moody and her cousin to cuff her.  (*Id.* at 01:54:20-24.)  The Deputies explained to Moody's cousin that they were going to cuff her "so she don't hurt herself."  (*Id.*)  As the Deputies grabbed Moody from her cousin, she resisted.  (*Id.* at 01:54:20-33.)  Moody grabbed at Stradinger's body-worn camera while saying "help me" repeatedly. (Stradinger BWC Pt. 1 at 01:54:25-34.)  Eventually the camera came off Stradinger's uniform and the video cut out.  (*See id.*)

The Deputies eventually laid Moody on her left side on the floor with her hands in front of her.  (*Id.* at 01:54:33-41.)  During this, Moody continued to shout, "help me."

4

(*Id.*)  The Deputies repeated "it's okay," "we are helping you," and "relax" throughout this process.  (*Id.* at 01:54:30-52.)  Once she was on the floor, Moody continued screaming and yelling "No!"  (*Id.* at 01:54:42-55:09.)  Eddicus held Moody's hands in front of her on the floor.  (*Id.*)  Stradinger sat on her upper legs to keep her from kicking or getting up.  (Stradinger Report at 2.)

The Deputies held her on her side for just under two minutes.  (*See* Eddicus BWC at 01:54:20-56:08.)  During those two minutes, Moody continued to say "no," scream, and rock back and forth on the floor intermittently.  (*Id.*)  The Deputies and Moody's family members continue to tell her to "relax" and "calm down."  (*Id.*)  When Moody was placed on her side, the hood of her sweatshirt flopped in front of her face, but it was not twisted around her neck.  (*Id.*)  Moody reached for her head multiple times while squirming on the floor.  (*Id.*)  Within thirty seconds of placing Moody on her side, Stradinger pulled the hood away from Moody's face.  (*Id.* at 01:55:04-05.)

Ten seconds later, the Deputies asked if Moody had taken or not taken any medication.  (*Id.* at 01:55:14-20.)  Moody responded "no" and her aunt said that she had not taken her medication.  (*Id.*)  After this response, Moody resumed rocking back and forth, screaming, and saying "no."  (*Id.* at 01:55:05-59.)  She also began to make grunt-like sounds while rocking back and forth.  (*Id.* at 01:55:24-59.)  About twenty seconds after Stradinger removed the hood from over her face, it flopped back to partially cover her face again, but it was not twisted around her neck.  (*Id.*)  During this commotion, the Deputies and Moody's family continued to tell Moody to "calm down."  (*Id.*)

After two minutes with Moody on her left side, the Deputies decided to move her onto her stomach so that they could cuff her hands behind her back.  (*Id.* at 01:55:54-56:08.)  As the Deputies moved her, Moody sat up on her elbows while on her stomach and was momentarily quiet, but about ten seconds later she started to scream again.  (*Id.* at 01:56:09-19.)  While Moody was up on her elbows, her hood flopped to the right side of her head and was not covering her face.  (*Id.*)  The hood was not twisted.  (*Id.*)  Next, Eddicus pushed Moody's neck with his forearm to get her to put her head on the floor while she continued screaming.  (*Id.* at 01:56:19-27.)  She was on her stomach while Eddicus continued to hold her arms to her right side.  (*Id.*)  A few seconds later she became still and quiet.  (*Id.* at 01:56:28.)

After about eight seconds of silence, Eddicus said he thought Moody was "playing possum."  (*Id.* at 01:56:37-38.)  At the same time, the Deputies moved Moody's left arm to her left side so that they could cuff her hands behind her back.  (*Id.* at 01:56:33-45.)  At this point the hood of her sweatshirt was slightly twisted to her right side and appeared to be under her face on the floor.  (*Id.*)  While the Deputies cuffed Moody's hands behind her back, her cousin repeatedly yelled "Keke" and rubbed Moody's head, but Moody did not respond.  (*Id.* at 01:56:45-57:06.)  It took the Deputies about thirty seconds to cuff Moody's hands.  (*Id.* at 01:56:33-57:08.)

A couple seconds after Moody was cuffed, the Deputies called the paramedics to tell them that the situation was controlled.  (*Id.* at 01:57:12-15.)  At the same time, Moody's cousin commented that Moody was not responding.  (*Id.*)  Once Moody was cuffed, Stradinger put his left knee and left hand on Moody's upper back for eighteen

6

seconds. (*Id.* at 01:57:14-32.) When he first placed his knee on Moody's back, Moody had been quiet for about forty-five seconds. Then, Stradinger removed his knee and placed his right hand on her back instead for about twenty-seven seconds. (*Id.* at 01:57:32-59.) During this time, Eddicus called for the medics two additional times, although he did not express any urgency in any of the three calls. (*Id.* at 01:57:24-26, 01:57:41-44.)

After Stradinger removed his right hand from Moody's back, he checked the hood around her neck and checked for a pulse. (*Id.* at 01:57:59-58:06.) Stradinger felt "a very rapid pulse." (Stradinger Report at 2.) Afterwards he placed his right hand on her back again. (Eddicus BWC at 01:58:07-16.) During these movements, Eddicus held on to Moody's hands, which were still cuffed behind her back. (*Id.*) Ten seconds later, Eddicus and Stradinger moved Moody off her stomach and onto her right side, into a "recovery position." (*Id.* at 01:58:17-25; Stradinger Report at 2.) Stradinger again checked to see if Moody was responsive or breathing. (Eddicus BWC at 01:58:25-30.) Eddicus asked Stradinger if Moody was breathing okay. (*Id.* at 01:58:29-32.) Stradinger shrugged and then continued to feel for a pulse. (*Id.* at 01:58:32-45.) Eddicus asked Stradinger about fifteen seconds later, "good pulse?" (*Id.* at 01:58:45-47.) Stradinger responded by nodding yes. (*Id.*)

In his report, Eddicus described Moody as "unresponsive" at this point. (Eddicus Report at 2.) Similarly, Stradinger wrote that Moody's "eyes were closed and she was going limp." (Stradinger Report at 2.) He also reported twice that she had a "rapid pulse" and he "could see [her] chest ris[ing] from her breathing but her breathing rate was

slow." (*Id.*)  The Deputies continued to monitor Moody while they waited for the paramedics to arrive at the house.  (Eddicus BWC at 01:59:00-2:00:40.)  They kept Moody on her right side with her hands cuffed.  (*Id.*)

The paramedics arrived at the house just under two minutes later.  (*Id.*)  This was just over three minutes after Eddicus first called for the paramedics and four minutes after Moody became quiet and stopped moving.  When the paramedics entered, the Deputies told them that Moody had been in "a pretty manic state," that they were trying to get her "cuffed," and then she went "limp," but that she might be "playing possum."  (*Id.* at 02:00:49-01:08.)  One paramedic responded "probably" to the statement that she might be playing possum.  (*Id.*)  The Deputies did not mention that Moody had a rapid pulse, that her breathing rate had slowed, or that they had previously held her in a prone position.  After about three minutes of discussion between the family, the Deputies, and the paramedics, the Deputies assisted the paramedics with lifting Moody onto a gurney outside.  (*Id.* at 02:00:40-03:52.)  While carrying Moody, one of the paramedics noted that there may be "an airway issue" and that Moody was "pretty unresponsive."  (*Id.* at 02:03:38-39.)

Eddicus and Stradinger went with the paramedics into the ambulance.  (*Id.* at 02:03:39-05:33.)  One paramedic instructed Eddicus to wait to take the cuffs off Moody until they were in the ambulance.  (*Id.* at 02:05:10-13.)  Eddicus did so about twenty seconds later.  (*Id.* at 02:05:30-52.)  Moody was cuffed for almost nine minutes.  (*See id.* at 01:57:08-02:05:52.)  After getting Moody hooked up to the various monitors, the paramedics found that she had no pulse and began CPR.  (*Id.* at 2:05:52-08:00.)  After

eight minutes of resuscitation efforts, Moody regained a pulse. (*Id.* at 02:16:40-42.) About ten minutes later, the paramedics took Moody to Regions for further treatment. (*See id.* 02:25:40-02:27:00.) Before leaving the scene, one of the paramedics clarified that Moody was not breathing on her own but had a pulse. (*Id.* at 02:25:12-18.)

Moody died at Regions four days later on February 10, 2020. (Doc. No. 53 ¶ 2, Ex. 1 at 1.) An Assistant Medical Examiner with the Ramsey County Medical Examiner found that Moody died from probable complications of excited delirium. (*Id.*) A blood test at Regions prior to Moody's death revealed that she had cocaine, benzodiazepines, and alcohol in her system. (*Id.* at 3.)

Following Moody's death, Standberry sued Ramsey County, Eddicus, and Stradinger for: two counts of excessive force (Counts 1 and 2); deliberately indifferent policies, practices, customs, training, and supervision (Count 3); deliberate indifference to the need for medical care (Count 4); and negligence and wrongful death (Count 5). (Doc. No. 1.) Defendants now move for summary judgment on all counts and to exclude the expert testimony of Dr. Ronald K. Wright. (Doc. Nos. 50, 58.)

## DISCUSSION

### I.    *Daubert* Motion

The Court first considers Defendants' motion to exclude the expert testimony of Dr. Ronald K. Wright. Before accepting the testimony of an expert witness, the trial court is charged with the "gatekeeper" function of determining whether an opinion is both relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90 (1993). Rule 702 of the Federal Rules of Evidence allows opinion testimony from a duly

qualified expert if:  (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "the testimony is based on sufficient facts or data;" (3) "the testimony is the product of reliable principles and methods; and" (4) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."  Fed. R. Evid. 702.

The Eighth Circuit has summarized this rule in a three-part test of admissibility: (1) the evidence is based on some specialized knowledge that is relevant and helpful for the trier of fact; (2) the proposed witness is qualified to give such testimony; and (3) the evidence is reliable.  *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). The proponent of the testimony must demonstrate these prerequisites by a preponderance of the evidence.  Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592.  Rule 702 favors admissibility over exclusion.  *Lauzon*, 270 F.3d at 686.

Generally, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)).  However, an expert opinion must be excluded if it is so fundamentally unsupported that it cannot assist the trier of fact.  *Id.* at 929-30.

Dr. Wright's expert report is a one-page report that only lists the materials he reviewed and three "opinions."  (Doc. No. 61 ¶ 2, Ex. 2.)  Under the "Materials Reviewed" heading, Dr. Wright only mentions:  (1) "Videos of Officers"; (2) "Autopsy

Report"; and (3) "Recount of witness in Ambulance." (*Id.*)  Under the "Opinions"

heading, Dr. Wright writes:

1.      Without the Ems report I cannot ascertain what happened here.

2.      However, the autopsy report strongly indicates this is an asphyxia
        death, heavy lungs and hemorrhagic pulmonary edema.

3.      Preliminarily, my opinion is that she suffered asphyxiation during
        her arrest.

(*Id.*)  The report contains no other substantive information.  Dr. Wright does not explain

his "opinions" beyond what is included above.

Defendants argue that Dr. Wright's testimony is speculative and will not be helpful

to the jury.  (Doc. No. 60 at 7.)  Standberry counters that the cause of death in Moody's

autopsy has a controversial history, Dr. Wright is exceptionally qualified, Dr. Wright's

report contains sufficient factual basis, and any lacking information should have been

addressed by Defendants deposing Dr. Wright.  (Doc. No. 64.)  In reply, Defendants

suggest that Dr. Wright's report violates Rule 26(a) of the Federal Rules of Civil

Procedure and rebut Standberry's other arguments.  (Doc. No. 68.)

The Court finds that Dr. Wright's report is so fundamentally unsupported that it

must be excluded under Rule 702.  While Dr. Wright certainly has the skills and training

to qualify as an expert on the topic of Moody's cause of death, his report provides no

information that confirms the reliability of his testimony.  The report includes no

information about the reasoning behind his conclusions or explanation of his

methodology.  Further, Defendants are correct that Dr. Wright's "opinions" are

speculative.  Notably, he labels his own conclusion preliminary and admits that he

"cannot ascertain what happened here." This is the kind of unreliable expert testimony that trial courts must keep out as gatekeepers.

Moreover, the Court agrees with Defendants that Dr. Wright's report violates the expert disclosure requirements of Rule 26(a). Rule 26(a)(2)(B) requires expert witnesses to produce a written report containing specific information about their testimony, including "a complete statement of all opinions the witness will express and *the basis and reasons for them*." Fed. R. Civ. P. 26(a)(2)(B) (emphasis added). Dr. Wright did not disclose the basis and reason for the opinions in his report. Under Rule 37(c) of the Federal Rules of Civil Procedure, a party may not use information or a witness at trial if that party failed to provide information required by Rule 26, unless the party can show "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Sylla-Sawdon v. Uniroyal Goodrich Tire Co.*, 47 F.3d 277, 284 (8th Cir. 1995) (applying this rule when an expert report lacked the required specificity). Other district courts in this Circuit have excluded expert reports under Rule 37 when they fail to disclose the basis and reasoning behind the expert's opinions. *See, e.g.*, *Knott v. MK Martin Trucking*, No. 23-cv-872, 2024 WL 5256507 (W.D. Mo. Dec. 3, 2024). The Court finds Dr. Wright's failure to include a factual basis is not substantially justified or harmless. Accordingly, Dr. Wright's testimony is properly excluded under Rule 37(c) as well.

In conclusion, Dr. Wright's expert testimony is not admissible, whether it be under Rule 702 or Rules 26(a) and 37(c). Therefore, the Court grants Defendants' motion to exclude Dr. Wright as an expert.

## II.    Motion for Summary Judgment

### A.    Legal Standard

Summary judgment is proper if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Weitz Co. v. Lloyd's of London*, 574 F.3d 885, 892 (8th Cir. 2009).  Where video evidence blatantly contradicts the nonmoving party's version of the facts, a court must view the facts in the light depicted by the video evidence.  (*See supra* note 2.)

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (alteration in original) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co*, 391 U.S. 253, 288 (1968)).

### B.    Qualified Immunity

The doctrine of qualified immunity protects state actors from civil liability for their discretionary acts when their "conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The defense provides "ample room for mistaken judgments" as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 343 (1986). To overcome qualified immunity, a plaintiff must show that: (1) the officer "violated a federal statutory or constitutional right"; and (2) the right was clearly established at the time of the violation. *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018). The Court has discretion to decide which prong to consider first. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### C.   Counts 1 & 2:  Excessive Force

Counts 1 and 2 allege excessive force against Eddicus and Stradinger, respectively. Defendants argue that the Deputies are entitled to qualified immunity on these two counts. (Doc. No. 52 at 9.) The Court first analyzes whether the Deputies' use of force was excessive and thus violated the Fourth Amendment. Then, it determines whether there was a clearly established right.

### 1.   Violation of Constitutional Right

To determine whether a use of force was excessive, a court must determine whether the officer's conduct was objectively reasonable. *Morgan-Tyra v. City of St. Louis*, 89 F.4th 1082, 1085 (8th Cir. 2024); *see also Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (describing objective reasonableness as the touchstone of Fourth Amendment analyses). To evaluate the reasonableness of an officer's conduct, a court analyzes the totality of the circumstances. *Barnes*, 145 S. Ct. at 1358. Some relevant factors may include: (1) "the severity of the crime at issue"; (2) "whether the suspect

14

poses an immediate threat to the safety of the officers or others"; (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight"; (4) the relationship between the need for force and the amount of force used; (5) the extent of the plaintiff's injury; and (6) any attempt to limit the force. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Reasonableness is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

The Deputies' initial use of force to grab Moody and hold her on the ground was objectively reasonable. While the Deputies had been dispatched for a medical call, not a criminal investigation, Moody was resisting being handcuffed and posed some level of risk to herself and others. She also made several movements with her arm that could have been interpreted by a reasonable officer as reaching for Eddicus's service weapon, especially given that she asked him to 'pull out his pistol' multiple times. It is not excessive force to restrain someone who has been resisting to prevent them from harming themselves or others. *See, e.g.*, *Hanson ex rel. Layton v. Best*, 915 F.3d 543, 546-48 (8th Cir. 2019).

However, after resisting arrest for several minutes, Moody became silent and stopped moving. She ceased resisting. At this point, the Deputies had not cuffed Moody and still held her arms to her right side. The Deputies moved her arms behind her back without any resistance and handcuffed her without any resistance. About forty-five seconds after Moody ceased resisting arrest and while she was lying on her stomach in a prone position, Stradinger applied pressure to her upper back using both his left knee and

his left hand.  He did this for a total of eighteen seconds.  Immediately after removing his left knee and left hand, he placed his right hand on Moody's back, in a somewhat lower position.  He did this for a total of twenty-seven seconds.

Applying pressure to a person's upper back who is bound, in a prone position, and not otherwise resisting arrest is not objectively reasonable.  This use of force was not necessary given that Moody had been silent and not made any kind of movement for forty-five seconds prior to the pressure.  She did not need to be controlled or further subdued.  She was no longer resisting arrest.  Law enforcement officers must adjust their level of force in response to changing circumstances.  *See Neal v. Ficcadenti*, 895 F.3d 576, 581 (8th Cir. 2018).  Therefore, the Court finds that the particular act of applying pressure to Moody's back while she was under control and no longer resisting arrest violated her constitutional rights.  The conduct prior to this use of force was not excessive because it was reasonable given that Moody was resisting.  Accordingly, the Court finds Eddicus is entitled to qualified immunity on Count 1 but continues its analysis to determine whether Stradinger's use of force violated a clearly established right.

### 2.      Clearly Established Right

A right is clearly established when there is "a sufficiently clear foundation in then-existing precedent."  *Wesby*, 583 U.S. at 63.  A clear foundation means that the law must be sufficiently clear such that every reasonable officer would understand that their conduct violates that right.  *See id.*  To make such a showing, a plaintiff may identify "existing circuit precedent that squarely governs the official's conduct, a robust consensus of persuasive authority on the issue, or a general constitutional rule that applies

with obvious clarity to the facts at issue." *Webster v. St. Louis County*, 135 F.4th 614, 617 (8th Cir. 2025). Courts must define clearly established law with a high level of specificity, not generally. *Wesby*, 583 U.S. at 63-64.

Defendants point to *Hanson ex rel. Layton v. Best*, 915 F.3d 543 (8th Cir. 2019), and *Lombardo v. City of St. Louis*, 38 F.4th 684 (8th Cir. 2022), to argue that the Eighth Circuit has found there is no clearly established right against the use of prone restraint on a suspect who has been resisting. (Doc. No. 52 at 16; Doc. No. 67 at 9-10.) Standberry argues that *Hanson* is distinguishable and points to precedent from other circuits to demonstrate a robust consensus of persuasive authority. (Doc. No. 65 at 20-24.)

In *Hanson*, police were called to check on a man sleeping in the foyer of a HyVee. 915 F.3d at 546. When officers woke up the man, he responded aggressively, so officers put him in a prone position and eventually handcuffed him. *Id.* After being handcuffed, the man continued to groan and thrash around, so the officers left him in a prone position and called an ambulance. *Id.* at 546-47. In finding that the officers were entitled to qualified immunity, the Eighth Circuit explained that there is "no clearly established right against the use of prone restraints for a suspect that has been resisting." *Id.* at 548.

In *Lombardo*, the Eighth Circuit reasserted its holding in *Hanson*, emphasizing that "there is no robust consensus of persuasive authority that would render the right [to be free from prone restraint when resisting] clearly established." 38 F.4th at 691. This rule, or lack thereof, about prone restraint while resisting is inapplicable to this case because Moody stopped resisting before Stradinger applied force to her back while she was in a prone position. Indeed, in *Lombardo*, the Eighth Circuit drew a clear contrast

17

between cases where a detainee resists arrest and cases where a detainee stops resisting or is otherwise compliant with an officer. *See id.* at 691-92 (citing *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893 (6th Cir. 2004); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003)).

Standberry points to five cases, each from a different circuit, to show that the right to be free from prone restraint in combination with pressure on the back after a detainee has ceased resisting is clearly established. (Doc. No. 65 at 20-24.) Each of the five cases demonstrates a scenario similar to this one where a person did not resist arrest or had stopped resisting arrest and law enforcement applied pressure to their back while they were on their stomach and handcuffed. *McCue v. City of Bangor*, 838 F.3d 55, 57-59 (1st Cir. 2016); *Weigel*, 544 F.3d at 1148-49; *Abdullahi v. City of Madison*, 423 F.3d 763, 765-66 (7th Cir. 2005); *Champion*, 380 F.3d at 896-97; *Drummond*, 343 F.3d at 1054-55. In each case, the circuit court found that the detainee had a right to be free from prone restraint in combination with pressure on the back after the detainee had stopped resisting, that law enforcement violated that right, and that the right was clearly established. *McCue*, 838 F.3d at 64; *Weigel*, 544 F.3d at 1155; *Abdullahi*, 423 F.3d at 770; *Champion*, 380 F.3d at 903; *Drummond*, 343 F.3d at 1062.

For example, in *Champion*, the Sixth Circuit explained that it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." 380 F.3d at 903. In *Drummond*, the Ninth Circuit found that "kneeling on the back and neck of a compliant detainee, and pressing the weight of

two officers' bodies on him even after he complained that he was choking and in need of air violate[d] clearly established law" despite the lack of Ninth Circuit or other federal case law directly on point. 343 F.3d at 1062. Furthermore, the Eighth Circuit has recognized three of these five cases as standing for propositions about the use of force against a detainee who is not resisting. *Lombardo*, 38 F.4th at 691-92.

In conclusion, the Court finds that Stradinger is not entitled to qualified immunity for using his knee and hands to place weight on Moody's back while she was handcuffed in a prone position and not resisting arrest. Accordingly, Defendants' motion for summary judgment is denied as to Count 2.[4]

### D.    Count 3:  *Monell* Claim Against Ramsey County

Standberry acknowledged that she did not develop sufficient evidence to support a *Monell* claim against Ramsey County. (Doc. No. 65 at 30.) Accordingly, Defendants motion is granted as to Count 3, and this claim is dismissed with prejudice.

### E.    Count 4:  Deliberate Indifference to a Serious Medical Need

Count 4 alleges deliberate indifference to a serious medical need against all Defendants. Defendants argue that the Deputies are entitled to qualified immunity on this claim and that Standberry cannot establish a claim against Ramsey County. (Doc. No. 52

---

[4]    The Court's decision to deny qualified immunity on Count 2 is not influenced one way or the other by its decision to exclude the expert testimony of Dr. Wright. The Court finds that a jury could infer a causal connection between Stradinger's use of force and Moody's injury in this case without expert testimony. *See Ziesmer v. Hagen*, 785 F.3d 1233, 1238-39 (8th Cir. 2015) (finding a lack of expert testimony on causation is not fatal to an injury "within the range of common experience").

at 9.)  The Court first analyzes whether the Deputies are entitled to qualified immunity.
Then, it determines whether Ramsey County can be held liable on this claim.

To start, Defendants do not dispute that the law is clearly established on deliberate
indifference.  (*See* Doc. No. 52 at 16-23; Doc. No. 67 at 11-14.)  A pretrial detainee's
right to adequate medical care is clearly established.  *Ryan v. Armstrong*, 850 F.3d 419,
427 (8th Cir. 2017).  Accordingly, the Court moves on to consider the first prong of the
qualified immunity analysis.

Under the first prong of qualified immunity, the Court must determine whether the
Deputies were deliberately indifferent.  Deliberate indifference claims under the
Fourteenth Amendment are analyzed using the same framework as the Eighth
Amendment.  *Vaughn v. Gray*, 557 F.3d 904, 908 n.4 (8th Cir. 2009).  To find that a
government official was deliberately indifferent to a serious medical need, a plaintiff
must demonstrate (1) an objectively serious medical need (2) that the official was
subjectively aware of but deliberately disregarded.  *Presson v. Reed*, 65 F.4th 357, 366
(8th Cir. 2023).

An objectively serious medical need is one that has either been diagnosed by a
physician as requiring treatment or is so obvious that even a layperson would recognize
the need for medical attention.  *Dantzler v. Baldwin*, 133 F.4th 833, 843 (8th Cir. 2025).
Standberry has met the objectively serous medical need prong.  The Deputies were called
to respond to a panic attack, Moody was distressed and frantic during their encounter, and
the Deputies were aware that she was experiencing some kind of mental health crisis.
Following the Deputies' use of force on her, Moody suddenly became unresponsive, and

the Deputies noted she had a rapid pulse and slow breathing. Even a layperson would recognize that Moody needed medical attention.

Defendants point to *Hanson* yet again, specifically for the proposition that there is insufficient evidence to support the objective prong when medical professionals at the scene do not suggest that treatment is warranted after performing a medical assessment. (Doc. No. 52 at 18-19.) That case is inapposite because once the paramedics performed a medical assessment of Moody in this case, they determined that she did not have a pulse and immediately started resuscitation efforts. Any failure to immediately recognize that Moody required medical attention by the paramedics could also be partially attributed to the Deputies because they failed to report the status of Moody's breathing and pulse and that they had previously held her in a prone position. Instead, the Deputies only reported that they believed Moody was "playing possum." *Hanson* does not apply here.

The bigger question is whether the Deputies were subjectively aware of Moody's medical need and deliberately disregarded it. Deliberate disregard requires showing more than mere negligence or even gross negligence. *Dantzler*, 133 F.4th at 843. Rather, deliberate disregard requires a mental state equal to criminal recklessness. *Id.* However, this mental state can be inferred where an officer's response to a known risk is "obviously inadequate." *Barton v. Taber*, 820 F.3d 958, 965 (8th Cir. 2016) (quoting *Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013)).

A factual question remains as to whether the Deputies deliberately disregarded Moody's objectively serious medical need. Eddicus and Stradinger both acknowledged in their reports that Moody was unresponsive after they handcuffed her. Stradinger noted

21

checking her pulse twice before paramedics arrived and both times noted a rapid pulse.

He also indicated that her chest "ris[ing] from breathing but her breathing rate was slow."

They also expressed that she might be "playing possum."  The Deputies did not report

any information about the force they had used, other than handcuffing, or Moody's rapid

pulse and slow breathing to the paramedics.  Medical personnel were not given the

information necessary to assess the risk to Moody's health.  This information is enough

for a jury to infer actual knowledge and find that their response was "obviously

inadequate."

Moreover, the Ramsey County Sheriff's Office's Policy Manual demonstrates that

the Deputies were subjectively aware of the risks to Moody's health.  The Policy

Manual's "Use of Force" section explains the following:

> Prior to booking or release, medical assistance shall be obtained for any
> person . . . who was rendered unconscious.
>
> . . .
>
> The on-scene supervisor, or if not available, the primary handling deputy
> shall ensure that any person providing medical care or receiving custody of
> a person following any use of force is informed that the person was
> subjected to force.  This notification shall include a description of the force
> used and any other circumstances the deputy reasonably believes would be
> potential safety or medical risks to the subject (e.g., prolonged struggle,
> extreme agitation, impaired respiration).
>
> Persons who exhibit extreme agitation, violent irrational behavior
> accompanied by profuse sweating, extraordinary strength beyond their
> physical characteristics and imperviousness to pain (sometimes called
> "excited delirium"), or who required a protracted physical encounter with
> multiple deputies to be brought under control, may be at an increased risk
> of sudden death.  Calls involving these persons should be considered
> medical emergencies.  Deputies who reasonably suspect a medical

> emergency should request medical assistance as soon as practicable and
> have medical personnel stage away if appropriate.

(Doc. No. 65-2 ¶ 8, Ex. 5 § 300.6.)  The policy requires a deputy to report more specific

information about the use of force in situations like this one.  It also warns of risks of

sudden death when working with a person exhibiting extreme agitation.  Accordingly, the

Court finds there is evidence to support deliberate indifference.  Eddicus and Stradinger

are not entitled to qualified immunity on Count 4.

Lastly, Standberry also brings this claim against Ramsey County.  Ramsey County

cannot be held vicariously liable for the actions of its employees.  *See Monell v. Dep't of*

*Soc. Servs. of N.Y.*, 436 U.S. 658, 691 (1978).  Standberry acknowledged that she failed

to establish sufficient evidence for a *Monell* claim.  Thus, Ramsey County is not a proper

defendant on this count and must be dismissed.

### F.    Count 5:  Negligence and Wrongful Death

Count 5 alleges negligence and wrongful death against all Defendants.

Defendants argue that Standberry's negligence claim is not viable and that they are

otherwise entitled to official immunity.  (Doc. No. 52 at 29-31.)  The Court starts with the

official immunity analysis.

Under Minnesota law, public officials are immune from tort liability for their

discretionary acts unless "the public official's exercise of independent judgment or

discretion is a willful or malicious wrong."  *Jepsen ex rel. Dean v. County of Pope*, 966

N.W.2d 472, 482-83 (Minn. 2021).  Public officials are also immune from suit for

ministerial acts unless "the public official fails to perform or negligently performs" that

ministerial act. *Id.* To conduct an official immunity analysis, a court must first determine whether the conduct at issue involved discretionary or ministerial acts. *Mumm v. Mornson*, 708 N.W.2d 475, 490 (Minn. 2006). Then, if the conduct is discretionary, the court decides whether the public official acted willfully or maliciously. *Id.*

Whether a public official's act is discretionary or ministerial is a question of law. *Kelly v. City of Minneapolis*, 598 N.W.2d 657, 664 n.5 (Minn. 1999). Ministerial acts are those "that are 'absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.'" *Id.* (quoting *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11*, 678 N.W.2d 651, 660 (Minn. 2004)). Police officers are generally considered discretionary officials. *Johnson v. Morris*, 453 N.W.2d 31, 41 (Minn. 1990). The parties appear to agree that the Deputies' actions in this case were discretionary. (Doc. No. 52 at 32; Doc. No. 65 at 30.) The Court agrees and moves to the next step of the analysis: whether the Deputies' acts were malicious or willful.

Malicious or willful means that the official "intentionally performs a wrongful act without legal justification or excuse or willfully violates a known right of the plaintiff." *Jepsen*, 966 N.W.2d at 482-83. In contrast to qualified immunity,[5] malice involves both a

---

[5]    Standberry suggests that the qualified immunity and official immunity doctrines are the same. (Doc. No. 65 at 32.) The Minnesota Supreme Court has held that they are different because of the subjective inquiry involved in official immunity analyses. *See Rico v. State*, 472 N.W.2d 100, 108 (Minn. 1991); *Elwood v. Rice County*, 423 N.W.2d 671, 677 (Minn. 1988); *see also Nelson v. County of Wright*, 162 F.3d 986, 991 (8th Cir. 1998) (recognizing those cases and the difference between the two doctrines). The Court wonders whether the subjective piece has eroded over time, but that is not a question for this Court. *See, e.g.*, *Smith v. Morales*, No. A07-2377, 2018 WL 4909630, at *3 (Minn. Ct. App. Nov. 18, 2008) ("If appellant's version of the facts is determined by a factfinder

subjective and an objective inquiry, although the Minnesota Supreme Court has explained

that the analysis relies more on the "objective inquiry into the legal reasonableness of an

official's actions." *State v. City of Mounds View*, 518 N.W.2d 567, 571 (Minn. 1994).  In

other words, a court looks at "whether the official has intentionally committed an act that

he or she had reason to believe is prohibited."  *Id.* at 571-72.  "[W]hether an officer acted

maliciously is usually a question of fact for the jury."  *Kelly*, 598 N.W.2d at 664 n.5.

However, a court should rule in favor of a defendant if "no reasonable jury could find the

[officers] acted with bad faith or malicious intent."  *Smith v. City of Minneapolis*, 754

F.3d 541, 549 (8th Cir. 2014) (alteration in original) (quoting *Elwood*, 423 N.W.2d

at 679).

Here, the Court adopts the analysis above on the objective reasonableness of the

Deputies' actions.  Eddicus's actions were reasonable, but Stradinger's were not,

specifically when he applied force to Moody's back while she was in a prone position and

after she had stopped resisting.  Malicious intent includes situations where an official

intentionally committed an act that they had reason to believe is prohibited.  Based on the

fact that his act was objectively unreasonable, the Ramsey County Sheriff's Office

policies on use of force, and other considerations, a reasonable jury could find that

Stradinger acted with malice.  Accordingly, the Court finds Eddicus is entitled to official

immunity, but Stradinger is not.  Because Stradinger is not entitled to official immunity,

---

to be more credible than the officers' version, a reasonable person could find that the
officers' initial use of force was not objectively reasonable and therefore malicious.").

Ramsey County is not entitled to official immunity under the doctrine of respondeat superior. *See Watson v. Metro. Transit Comm'n*, 553 N.W.2d 406, 414 (Minn. 1996).

However, to the extent that Standberry's wrongful death claim is at all based on negligence, that theory is dismissed with prejudice. The claim only remains based on excessive force. A negligence claim based on discretionary acts cannot survive official immunity. Such a claim necessarily relies on negligent acts, which are covered by official immunity. *See Jepsen*, 966 N.W.2d at 482 (explaining that a plaintiff has no civil recourse against a negligent public official for discretionary acts under official immunity); *see also Doe v. Anoka County*, No. 21-cv-2649, 2025 WL 756449, at *13 (D. Minn. Mar. 10, 2025) (dismissing a negligence claim because official immunity covers that type of claim for "basic legal reasons"), *appeal docketed*, No. 25-1568 (8th Cir. Mar. 21, 2025).

## CONCLUSION

A partial victory here for Standberry does not guarantee a victory at trial. The Court encourages the parties to consider settlement rather than further litigation. The Court believes that settling this case would also provide some closure on a very difficult experience for Moody's family.

## ORDER

Based upon the foregoing and the record in this case, **IT IS HEREBY ORDERED** that:

1.      Defendants Ramsey County, Steven Eddicus, and Joe Stradinger's motion to exclude expert testimony of Dr. Ronald K. Wright (Doc. No. [58]) is **GRANTED**.

2.      Defendants Ramsey County, Steven Eddicus, and Joe Stradinger's motion for summary judgment (Doc. No. [50]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      The motion is granted as to Counts 1 and 3.

      b.      The motion is denied as to Count 2.

      c.      The motion is granted as to Ramsey County on Count 4.  Count 4 remains as to Defendants Eddicus and Stradinger.

      d.      The motion is granted as to Defendant Eddicus on Count 5.  Count 5 remains as to Defendants Ramsey County and Stradinger, but solely based on the underlying wrong of excessive force, not negligence.

3.      Counts 1 and 3 are **DISMISSED WITH PREJUDICE**.

4.      Based on footnote 1, the Clerk of Court is directed to correct the party text for Plaintiff to "*as Trustee for the Next of Kin of Nekeya Tamara Moody*."


Dated:  June 10, 2025                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge